CALDOR, INC., a New York
Corporation, Plaintiff,

v.

MATTEL, INC., a Delaware
Corporation, Defendant.

No. 91 Civ. 3527(KC).

United States District Court,
S.D. New York.

March 31, 1993.

Martin Karlinsky, Camby Karlinsky & Stein, New York City, for plaintiff.

George W.C. McCarter, McCarter & English, New York City, for defendant.

## OPINION AND ORDER

CONBOY, District Judge:

The plaintiff Caldor, Inc. has brought this action seeking a declaratory judgment delineating the rights and obligations of the parties under a 1975 written Guarantee Agreement, in which Caldor guaranteed to the defendant, Mattel, Inc., the present and future debts of Leisure Line Toys, Inc. ("Leisure Line"), then a subsidiary of Caldor. The defendant has filed a counterclaim seeking damages of approximately $2.4 million from Caldor and has moved for summary judgment to enforce the Guarantee. The plaintiff has also moved for summary judgment declaring that the Guarantee is of no force or effect and that Caldor has no liability under the Guarantee to the defendant. For the reasons set forth below, the Court denies the summary judgment motions of both plaintiff Caldor and defendant Mattel.

### Background

The Guarantee at issue in this litigation arose from the business activities of Leisure Line Toys, Inc., a wholly owned subsidiary of Caldor, formed in April 1973 to conduct a wholesale toy distribution business for Caldor and other retailers. Leisure Line, operated by a Caldor employee named George Forst, purchased toys from various toy manufacturers, including Mattel.

In 1975, Mattel required Leisure Line to secure a guarantee of its parent, Caldor, with respect to extensions of credit by Mattel to Leisure Line. *See* "Memorandum of Plaintiff Caldor, Inc., in Support of its Motion for Summary Judgment" ("Plaintiff's Memorandum"), May 8, 1992, at 4. The Guarantee Agreement, which was signed by the President of Caldor, states:

> For and in consideration of the extension of credit by ... Mattel ... to Leisure Line ..., a wholly owned subsidiary of the undersigned, Caldor, Inc., the undersigned hereby unconditionally guarantees the payment of any indebtedness which may at

any time and from time to time be owing to Seller by Leisure Line....

Plaintiff's Notice of Motion, May 8, 1992, Exhibit A. The Guarantee further provided that it "shall continue in full force and effect until such time as Seller shall receive written notice of revocation." *Id.* A resolution of Caldor's board of directors was annexed to the Guarantee and affirmed the commitment of Caldor:

> Resolved, that the Officers of this Corporation be and they are hereby authorized to execute and deliver guarantees of the obligations of its wholly owned subsidiary, Leisure Line Toys, Inc.

*Id.*

From 1975 through 1981, Leisure Line continued its operations as a wholly owned subsidiary of Caldor. In 1981, as a result of a corporate merger, Leisure Line was merged into Caldor. From 1981 through 1987, the business of Leisure Line was conducted through and by an operating division of Caldor known as the Leisure Line Division. *See* "Brief in Support of Defendant's Motion for Summary Judgment" ("Defendant's Brief"), May 7, 1992, at 3 (paras. 9–10); Plaintiff's 3(g) Statement, at 3 (paras. 9–10).

In 1986, Caldor was acquired by The May Department Stores Company, Inc., a public company domiciled in St. Louis, Missouri. In 1987, Caldor divested itself of certain assets not directly related to its retailing business. Among these were the assets used in the operation of the Leisure Line Division, including its contracts, trade name, goodwill, and hard assets. *See* Plaintiff's 3(g) Statement, at 4 (para. 15).

The acquisition of the Leisure Line Division assets was made by a New Jersey corporation called George Forst Corporation, formed and owned by the former chief executive officer of the Leisure Line Division, George Forst. Forst's employment with Caldor was terminated at that time. *See* Plaintiff's 3(g) Statement, at 4 (para. 15). On October 27, 1987, eight days after the closing of the acquisition, the George Forst Corpora-

tion changed its name to Leisure Line Toys, Inc.[1] *See* Plaintiff's 3(g) Statement, at 4 (para. 16). From October 1987 through January 1990, when it became insolvent and ceased operations, the new Leisure Line was a company separate from Caldor. *See Id.* at 5 (para. 17); Plaintiff's Memorandum, at 6.[2] During this period Caldor and Leisure Line maintained an economic relationship,[3] but Caldor doesn't seem to have exercised any control or ownership over Leisure Line after the sale to Forst. *See* Defendant's Brief, at 5–6 (para. 18).

Leisure Line was not successful on its own. It fell behind in payments due Mattel, and on February 1, 1990, Mattel placed the account up for collection. *See* Defendant's Brief, at 6 (para. 19). On April 27, 1990, Mattel made written demand upon Caldor to honor the Guarantee Agreement and attached an itemized statement showing the amount due, after credits, as $2,404,210.05.[4] *See Id.* On May 9, 1990, Caldor responded with a letter denying all liability under the Guarantee Agreement. *See Id.* This litigation followed.

### Discussion

#### A. Choice of Law

■ As a preliminary matter, the Court must decide which substantive law to apply. In a diversity action, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "New York courts apply a 'paramount interest' test to choice of law issues in contract disputes. Under that test, 'the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'" *Wildenstein &*

*Co. v. Wallis*, 756 F.Supp. 158, 161 (S.D.N.Y. 1991), *rev. on other grounds*, 983 F.2d 1047 (2d Cir.1992) (citations omitted).

■ Five states have connections with this lawsuit: New York (Caldor's state of incorporation, its chosen forum for this lawsuit, and the locus of Leisure Line's insolvent estate), Connecticut (Caldor's principal place of business, and the place where the Guarantee was executed), New Jersey (Leisure Line's state of incorporation and former principal place of business), Delaware (Mattel's state of incorporation), and California (Mattel's principal place of business).

Mattel has assumed that New York law governs. *See* "Brief of Defendant Mattel, Inc. in Opposition to Plaintiff's Motion of Summary Judgment" ("Defendant's Brief in Opposition to Plaintiff's Motion"), June 4, 1992, at 5. Caldor appears to prefer California law (*See* Plaintiff's Memorandum, at 9), but cites six New York decisions in its initial brief (and only two from California), and concedes that "[t]he common law of suretyship and guarantee ... does not materially vary from state to state." *Id.* Under these circumstances, and given the fact that we believe New York has at least as many factors connecting it to the litigation as any other state, the Court will apply New York substantive law to the case.

#### B. Interpreting the Guarantee

■ A guarantee agreement is to be construed like other contracts in order to give effect to the parties' intentions. *Fehr Bros., Inc. v. Scheinman* (hereinafter "*Fehr Bros., Inc.*"), 121 A.D.2d 13, 509 N.Y.S.2d 304, 306 (1986). "In particular, the obligations of the guarantor must be strictly construed accord-

---

1. Mattel states that "[i]t was understood that, immediately upon commencing business, this corporation would adopt the name Leisure Line Toys, Inc." Defendant's Brief, at 4–5 (para. 15).

2. The plaintiff alleges, and Mattel does not deny, that Mattel was aware of the changes in the ownership of Leisure Line as they occurred. *See* Plaintiff's 3(g) Statement, at 3 (para. 11), 5 (para. 18).

3. Not surprisingly, Caldor seeks to minimize the importance of the post-sale relationship between

itself and Leisure Line (*See* Plaintiff's Memorandum, at 16), while Mattel emphasizes the closeness of the relationship (*See* Defendant's Brief, at 5–6 (para. 18)).

4. The plaintiff alleges, and the defendant does not deny, that the indebtedness which is at issue in this case, approximately $2.4 million, arose after the sale of Leisure Line to Forst. Mattel seeks to recover for Leisure Line's liabilities arising between December 1988 and January 1990. *See* Plaintiff's Memorandum, at 7–8.

ing to the terms of the agreement and cannot be altered, extended or enlarged by the creditor or debtor without the guarantor's consent, since he cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty." *Id.*

■ The Guarantee Agreement in this case does not provide for the contingency of Caldor selling Leisure Line. After examining the Guarantee Agreement in order to discern the intentions of the parties with respect to this contingency, the Court finds that its terms are ambiguous. Both sides have put forth plausible interpretations of the guarantee by stressing different words and sections in the agreement. Mattel emphasizes the facts that Caldor "unconditionally" guaranteed the payment of Leisure Line's debt and that Caldor never exercised its written revocation to end the Guarantee in accordance with its terms. *See* Defendant's Brief in Opposition to Plaintiff's Motion, at 6; Defendant's Brief, at 13. Caldor points to the description of Leisure Line in the Guarantee as "a wholly owned subsidiary of the undersigned, Caldor" and to the Directors' Resolution annexed to the Guarantee which authorizes the officers of Caldor to "deliver guarantees of the obligations of its wholly owned subsidiary, Leisure Line Toys, Inc." *See* Plaintiff's Memorandum, at 10–11. The Court is uncertain as to whether the term "wholly owned subsidiary" was included in the Guarantee as a term of limitation or description. In other words, did the parties intend the term "wholly owned subsidiary" to create the condition that the Guarantee would end if and when Leisure Line was no longer a wholly owned subsidiary of Caldor? Or, did the parties really mean "unconditionally" when they included it in the Guarantee, in which case they used the term "wholly owned subsidiary" simply as a way in which to describe and identify the company receiving the Guarantee?

■ Mindful of our obligation in deciding summary judgment motions to give full weight to the non-moving party's evidence and draw every reasonable inference in its favor (*Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 611 (2d Cir.1979); *Merritt Forbes*

*& Co. v. Newman Inv. Securities*, 604 F.Supp. 943, 952 (S.D.N.Y.1985)), the Court is unwilling to accept either side's interpretation of the parties' intentions. The Court recognizes that it can look to parole evidence to resolve the ambiguity in the Guarantee Agreement (*J.J. Newberry Co. v. Kingston Plaza, Inc.*, 31 A.D.2d 862, 297 N.Y.S.2d 184, 186 (1969)), but finds that the evidence submitted by the parties is inconclusive for the purpose of determining their intentions.

### C. Caldor's Arguments

The plaintiff Caldor makes two arguments in support of its claim that Caldor has been released of all liability under the Guarantee. First, plaintiff maintains that by its terms, the Guarantee was only intended to apply to its wholly owned subsidiary Leisure Line and not to the new entity created by the sale to Forst. We disagree. In the Agreement, Caldor "unconditionally" guarantees the present and future debts of Leisure Line. As stated above, the Guarantee is silent as to the consequences of Caldor divesting itself of Leisure Line. In the face of this silence, we will not read into the Guarantee a condition which, while it may have been intended by the parties, is not explicitly mentioned nor clearly implied.

■ The Court recognizes that if Leisure Line had truly become a "new entity" after the sale to Forst, Caldor would be released from its obligations under the Guarantee. *See Anti-Hydro Company, Inc. v. Castiglia*, 92 A.D.2d 741, 461 N.Y.S.2d 87 (1983) ("a guaranty does not extend to a subsequent entity if there has been a true change in the composition or structure of the enterprise." *Id.*, 461 N.Y.S.2d at 88). However, there is ample evidence that new Leisure Line was *not* a new "unrelated" entity as Caldor maintains. *See* Defendant's Brief ("After the sale to Forst, Leisure Line continued to operate precisely the same business at precisely the same location in Secaucus, New Jersey, where the sign in front still said 'Inc.', just as it always had. The banking arrangements remained the same, and all the former 'division's' employees were offered employment at Leisure Line Toys, Inc." *Id.* at 5 (para. 16) (citations omitted)). Change

in corporate ownership does not by itself transform a company into a new entity. *See Fehr Bros., Inc.* ("a corporation is an entity endowed with a separate and distinct identity from that of its individual members or stockholders, and that identity remains unchanged and unaffected notwithstanding changes in the corporation's ownership . . ." *Id.,* 509 N.Y.S.2d at 309).

The plaintiff has presented insufficient evidence that Leisure Line became a new and distinct entity after the sale to Forst. Accordingly, we find that Leisure Line's allegedly "new" identity as a result of the sale to Forst does not discharge Caldor of its obligations under the Guarantee.

■ Caldor also argues that its loss of control over Leisure Line as a result of the sale constituted a material alteration of the assumed risks, thereby voiding the Guarantee as to all subsequent liabilities. A guarantor is discharged from its obligations under the Guarantee if the entity whose debts are guaranteed undergoes a change which dramatically and significantly alters the nature of the risk originally undertaken by the guarantor. *See Bernardi Bros., Inc. v. Great Lakes Distributing,* 712 F.2d 1205, 1207 (7th Cir.1983). For example, in *Teledyne Mid-America Corporation v. HOH Corporation,* 486 F.2d 987 (9th Cir.1973), the Court discharged a married couple from its obligations under a guarantee to pay the debts of a sole proprietorship run by the husband. Subsequent to the guarantee, the sole proprietorship was incorporated and greatly expanded with new stockholders acquiring majority control of the business. The Court reasoned that these changes justified releasing the couple from their guarantee:

> With additional corporate capital for use in expanded operations, his liability became greatly expanded and his control diluted. Both he and his wife may well have declined to risk their personal fortunes to such an enlarged undertaking as guarantors of a corporate liability.

*Id.* at 990. In this case, Caldor has lost its control over Leisure Line. However, Caldor has made no showing that the nature of Leisure Line's business changed at all after the sale or that the relationship between Leisure Line and Mattel was altered significantly. The loss of Caldor's control over the debtor did change the nature of the risk, but, standing alone, loss of control is not enough to discharge the duties of the Guarantor. Caldor has produced insufficient evidence that its risk after the sale was fundamentally changed.

In addition, the Court observes that Caldor itself created the conditions that caused its loss of control and thus can be considered to have consented to the increased risk. *See United States Shoe Corp. v. Hackett,* 793 F.2d 161 (7th Cir.1986) ("a guarantor may consent to the increased risk by creating it."); *Fehr Bros., Inc.* ("In the face of clear language indicating the absolute and unconditional nature of the guaranty, defendant cannot escape liability by relying on changes he initiated for his benefit, which changes did not, in any case, have the effect of creating a new corporate entity or materially altering the relationship between the principal-debtor and the creditor or the obligations defendant freely chose to assume under the guaranty." *Id.,* 509 N.Y.S.2d at 310). Accordingly, we find that, while Caldor did lose control over Leisure Line, its risk under the guarantee was not fundamentally altered so as to justify discharging its obligations under the Guarantee.

### D. Mattel's Arguments

Defendant Mattel makes two arguments in support of its motion to hold Caldor liable under the Guarantee. First, Mattel maintains that the corporate changes undergone by Leisure Line did not "significantly alter" the parties' relationship and thus cannot affect the validity of a continuing guarantee. In essence, Mattel seems to be arguing that despite the sale to Forst, nothing really changed: Leisure Line continued to be "a creature of Caldor" (Defendant's Brief, at 7), and the relationship between Leisure Line and Mattel was not significantly altered (*See Id.* at 8).

Presumably, Mattel is trying to fit this case within the framework of a long line of cases that prohibit a guarantor from escaping his obligations by making superficial or

nominal changes to the entity whose debts it has agreed to guarantee. For example, Caldor clearly could not escape its liability under the guarantee by simply changing the name of Leisure Line. *See State v. International Fidelity Ins. Co.,* 152 A.D.2d 77, 547 N.Y.S.2d 466 (1989) ("The case law makes abundantly clear that mere formalistic changes in the identity of a principal obligor do not discharge the surety." 547 N.Y.S.2d at 468).

Mattel seems to suggest that the sale to Forst was not as simple as all the evidence indicates and that Caldor still exercised some control over Leisure Line after the sale. *See* Defendant's Brief, at 7 ("the Leisure Line Toys, Inc. that existed after 1987 was a creature of Caldor itself . . ."); 12 ("the Leisure Line of today *is* Leisure Line of 1975, 'with a new shell'" (emphasis in original)); 16 ("Caldor *never* disassociated itself from Leisure Line, even after Leisure Line had become an independent corporation . . ." (emphasis in original)). Unfortunately for the defendant, there is no evidence that the sale was anything other than what it appears to be—a complete divestiture by Caldor of its ownership of Leisure Line. The fact that Caldor continued to have an economic relationship with Leisure Line doesn't affect the conclusion that Caldor no longer exercised any control over or had any ownership interest in Leisure Line.

The Court finds that while the sale did not seem to affect the relationship of Mattel and Leisure Line, it did significantly alter the relationship of Caldor and Leisure Line. Far from remaining "a creature of Caldor," Leisure gained its independence, and Caldor lost all its control over its erstwhile subsidiary. Given the explicit description of Leisure Line in the Guarantee and in the annexed Directors' Resolution as the "wholly owned subsidiary" of Caldor, the Court believes that the change in the relationship between Leisure Line and Caldor introduces uncertainty as to the continuing nature of the Guarantee.

Mattel also argues that Caldor is liable under the Guarantee because it never exercised its right of written revocation as provided in the Guarantee. The Court dis-

agrees. Mattel correctly cites the legal principle that a written guarantee remains in effect until terminated in the manner specified in the agreement itself. *See Chemical Bank v. Wasserman,* 37 N.Y.2d 249, 371 N.Y.S.2d 919, 920, 333 N.E.2d 187, 188 (1975). Mattel fails to note, however, that a guarantee that contains a written revocation requirement can also be terminated by operation of law. For example, where the nature of the risk to the guarantor is fundamentally changed, or where the parties intended and understood that the guarantee would be discharged when a particular event occurred (i.e., the sale by the guarantor of the entity it had guaranteed), a written revocation would be unnecessary to discharge the obligations of the guarantor despite the presence of a written revocation requirement in the guarantee agreement. Accordingly, we find that the failure of Caldor to exercise its right of written revocation did not necessarily prevent the termination of the Guarantee Agreement.

### Conclusion

The Guarantee Agreement between Caldor and Mattel did not provide for the contingency of Caldor selling off Leisure Line. As a result, in the wake of the sale to Forst, the status of the Guarantee is uncertain. The Court will not read its interpretation into the Agreement to make up for this deficiency in the Guarantee. Accordingly, we deny both the summary judgment motions of the plaintiff Caldor and the defendant Mattel.

SO ORDERED.